IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHEN MILLER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:13-CV-1984-D |
| VS. | § | |
| | § | |
| METROCARE SERVICES (formerly | § | |
| Dallas MHMR), et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff Stephen Miller ("Miller") alleges that he was terminated as the Human Resources Director of defendant Metrocare Services ("Metrocare") due to acts of discrimination and retaliation that violated his rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*; the Texas Commission on Human Rights Act ("TCHRA"), Tex. Labor Code Ann. § 21.001 *et seq.* (West 2006); and without the name-clearing hearing to which he was entitled, remediable under 42 U.S.C. § 1983.  Concluding that a reasonable jury could not find in his favor on any of his claims, the court grants defendants' motion for summary judgment and dismisses this action with prejudice.

I

A

Miller sues defendants Metrocare, Kyle Munson ("Munson"), and Linda Thompson ("Thompson") to recover under the FMLA, the ADA, the FLSA, the TCHRA,[1] and 42 U.S.C. § 1983.  In 2006 Metrocare, a non-profit community center that provides mental health services to residents in the Dallas County area, hired Miller as its Human Resources Manager.[2]  Miller reported to defendant Munson, the Chief Financial Officer.  As part of the hiring process, Miller submitted to a criminal background check, which revealed that he had a conviction in high school.  Miller discussed this with Yolanda Ross ("Ross"), a Human Resources Department employee, who indicated that the conviction would not bar his employment under the regulatory list of offenses that would preclude employment.

In 2009 Miller was given the title of Human Resources Director ("HR Director").  In this position, he was responsible for ensuring that Metrocare complied with federal and state

---

[1]In his second amended complaint, Miller cites the TCHRA as a basis for his action as a whole, *see* 2d Am. Compl. ¶ 1.01, but it appears that he relies only on the TCHRA in connection with his disability-based claim, *see id.* at ¶¶ 7.03 and 7.07.  Regardless how Miller's TCHRA claim should be applied, given the substantial similarities between Texas and federal anti-discrimination and anti-retaliation laws,  *see, e.g., Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999), the results of the court's decision would be the same under either.  The court therefore assumes that its decisions apply equally to any corresponding claim based on the TCHRA.

[2]In recounting the factual background, the court summarizes the evidence in the light most favorable to Miller as the summary judgment nonmovant and draws all reasonable inferences in his favor.  *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

employment laws, handling employee relations issues, managing the organization's employee benefits programs, and leading Metrocare's compensation and recruiting efforts. During his first year of employment, Miller noticed that almost all of Metrocare's case management employees were classified as exempt for FLSA purposes. Based in part on a Department of Labor ("DOL") decision holding that mental health case managers were non-exempt, Miller believed that these employees had been misclassified, and he began "pushing the issue" with Munson. P. Br. 2. Throughout 2007 and 2008, Miller engaged in a series of communications with other Mental Health and Mental Retardation ("MHMR") centers and discussions with Metrocare senior managers, including Munson, about the exemption status of case managers. In January 2009 Metrocare's then-Chief Executive Officer, Dr. James Baker, decided to change the classification of certain groups of case managers to non-exempt status. Because the FLSA requires that non-exempt employees be paid overtime, and given Metrocare's limited financial resources, Metrocare implemented a "comp time" policy under which it awarded compensatory time, rather than pay overtime, to nonexempt employees. Additionally, Metrocare did not allow nonexempt employees to work overtime without CEO approval.

According to Miller, he began receiving complaints almost immediately about the new policy, including that certain positions were very demanding and that the work could not be completed within a 40-hour workweek; that managers were changing employee time cards to reflect 40-hour workweeks; and that employees were not being allowed to report overtime that they had worked. Metrocare abandoned the "comp time" program in March 2012, after

a staff member complained directly to the Chairperson of the Metrocare Board that the Business Operations Director had instructed her managers (the time-keepers) to pressure staff not to report overtime work.

In August 2012 defendant Thompson became Metrocare's acting CEO.  Miller contends that he received complaints that Thompson and two of her subordinate managers were threatening employees not to report overtime work.  He alleges that one staff member resigned because she worked overtime without being properly compensated.

On December 28, 2012 Miller met with Thompson regarding the wage and hour issues involving case managers and managers.  During the meeting, Miller offered to put together some additional training about overtime reporting and practices.  According to Miller, Thompson was very receptive to the suggestion and authorized him to do it.

A few days later, Munson notified Miller by email that he was required to identify two full-time positions from his department to be included in a reduction in force ("RIF") resulting from Metrocare's financial losses.[3]  Miller selected HR Generalist Sam Clark ("Clark") and Bertha Reyna ("Reyna").  According to Miller, Metrocare terminated eight employees in all as part of the RIF, two of whom were HR employees.[4]

Miller suffers from dyslexia, which he contends impairs his ability to read and learn.

---

[3]Munson had first approached Miller regarding the RIF in "late 2012," and requested possible scenarios to reduce the budget on or around December 12, 2012.  P. Br. 8.

[4]Defendants contend that 18 positions were eliminated as part of the RIF in January 2013.

He had previously sought help from Clark to proofread important emails and policy statements.  Miller contends that, once Reyna and Clark departed, he required a data entry clerk to assist with benefits work, as a "reasonable accommodation" for his dyslexia.  P. Br. 11.  He also maintains that he requested additional time to conduct a previously-scheduled employee Wellness Fair if Metrocare refused his recommendation to cancel the event.  Miller then canceled the Wellness Fair and an employee gift card incentive, without the permission of Munson or Thompson.  At the instruction of Munson and Thompson, Miller rescinded the cancellation of the gift card incentive program, but the Wellness Fair could not be held because Reyna, allegedly at Miller's instruction, had already informed the third-party vendors that it had been canceled.  Metrocare subsequently hired a part-time data entry clerk.

Because Metrocare's operations are governed by specific state regulations that prohibit it from employing a person who has been convicted of certain offenses, it follows an extensive background check practice.  When an employee applies for a position, Metrocare runs a one-time nationwide criminal background check.  It also performs annual criminal background checks on employees using the Texas Department of Public Safety criminal history database.  Metrocare's HR Department is responsible for ensuring that these checks are completed.

On January 17, 2013 Ross, an HR Generalist and subordinate of Miller, made a formal complaint to Munson about Miller's conduct.  She accused him, *inter alia*, of overriding Metrocare policies to benefit his own needs in relation to criminal background checks and FMLA leave.  In response to the complaint, Munson conducted an investigation.

- 5 -

In a February 1, 2013 internal memorandum, Munson found that Miller had removed his name from the list of employees due for an annual criminal background check for the years 2010, 2011, and 2012, and, for the same three years, had fraudulently updated the system to reflect that the criminal background checks had been completed.[5]  Ds. App. 126. According to Metrocare, Munson believed that this conduct might warrant termination, but he wanted to take time to ensure that terminating Miller was the right decision for Metrocare. Munson was continuing to consider the matter when, in late February, he learned that Miller had also falsely indicated in Metrocare's system that approximately 70 background checks had been run on various Metrocare employees when, in fact, they had not.  Metrocare maintains that Munson decided that Miller's cumulative conduct required termination, and, on February 26, 2013, he sent a final draft of his termination letter to Metrocare's outside counsel and indicated that he intended to terminate Miller's employment later that week.

On February 28, 2013 Miller placed a letter under Thompson's door in which he alleged that Metrocare and Munson had repeatedly violated the FLSA and had retaliated against him for airing complaints about the misclassification of workers; continued to bully employees to record their time inaccurately; rescinded a promotion and then fired an employee as an "organizational risk" who had documented overtime hours in the past, had used the ethics hotline to get changes made, and had threatened to file a complaint with the

---

[5]Miller contends that, because he was not a direct care provider, he was not required to submit to annual criminal background checks, but could do so at his discretion as the HR Director.

DOL; fired employees while they were taking FMLA leave or violated DOL guidelines in terms of treatment of FMLA-qualified employees; instructed employees not to participate in board meetings subject to the Open Meetings Act; and were requiring Miller to act as a data entry clerk, which was outside of his job description, even though he has dyslexia, and were thereby effectively denying a requested reasonable accommodation.  That same day, only hours after delivering the letter to Thompson, Miller was terminated via email based on an accusation of deliberate falsification of records.  The February 28, 2013 termination of employment letter states that Miller falsified data entries related to the required criminal background checks for the month of December 2012 and used his position as HR Director to remove his name from the required criminal background checks in 2010, 2011, and 2012.

After his termination, Miller made a written demand on Metrocare for a "name clearing" hearing.  According to Miller, although his counsel was given a limited opportunity to explain the wrongful nature of Miller's termination to the Metrocare Board of Trustees, he was not offered the right to call witnesses, confront the alleged evidence against him, or appeal the adverse decision, and no action has since been taken to clear his name, remove the stigmatizing information from his personnel file, or reverse the decision to fire him based on the stigmatizing claim of misconduct.

B

Miller initially filed this lawsuit against only Metrocare, alleging claims under the FMLA, ADA, FLSA, and TCHRA.  He then amended his complaint to add Munson and

Thompson as defendants[6] and to allege claims under 42 U.S.C. § 1983 and Tex. Health & Safety Code Ann. § 161.134 (West 2010) ("Section 161.134").  Metrocare moved under Fed. R. Civ. P. 12(b)(6) to dismiss Miller's claims under § 1983 and Section 161.134.  In *Miller v. Metrocare Services*, 2014 WL 3512975 (N.D. Tex. July 16, 2014) (Fitzwater, C.J.) ("*Miller I*"), the court granted Metrocare's Rule 12(b)(6) motion to dismiss Miller's § 1983 claim, and, treating Metrocare's motion to dismiss Miller's Section 161.134 claim as a Rule 12(b)(1) motion, it also dismissed that claim.  *Id.* at *5.  The court granted Miller leave to replead his § 1983 claim.  *Id.*

Before the court issued its opinion in *Miller I*, defendants filed the instant motion for summary judgment.  After defendants moved for summary judgment, Miller filed his second amended complaint.  Defendants move to strike portions of the second amended complaint that they maintain exceed what the court permitted in *Miller I* when it granted Miller leave to replead.  They also move to strike portions of his summary judgment evidence.  Miller opposes these motions.

## II

Because Miller will bear the burden of proof on his claims at trial, defendants can meet their summary judgment obligations by pointing to the absence of admissible evidence to support the claim in question.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once defendants do so, Miller must go beyond his pleadings and designate specific facts

---

[6]Miller's claims under the FMLA and FLSA were brought against Metrocare, Munson, and Thompson.  His remaining claims were asserted only against Metrocare.

showing there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict in Miller's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Miller's failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.) (citations omitted).  Summary judgment is mandatory if Miller fails to meet this burden.  *See Little*, 37 F.3d at 1076.

III

Miller alleges that all three defendants are liable under the FLSA for retaliating against him, in violation of the anti-retaliation provision of 29 U.S.C. § 215(a), by terminating his employment in response to his complaints about Metrocare's overtime policy, its misclassification of employees, and its failure to pay overtime.  Miller maintains that Munson and Thompson are individually liable because they acted directly or indirectly in Metrocare's interest.

A

The FLSA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter[.]"  29 U.S.C. § 215(a)(3).  Because Miller relies on circumstantial evidence to support his FLSA retaliation claim, he must proceed under the familiar *McDonnell Douglas* burden-shifting framework.  *See Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008)

("Although *McDonnell Douglas* was a Title VII case, the burden-shifting framework established therein has been adapted and applied to cases under the . . . FLSA.").

Miller must first demonstrate a prima facie case for retaliation by showing that (1) he engaged in protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *See, e.g., Blackburn v. Cypress Equities I, LP*, 2014 WL 4771765, at *8 (N.D. Tex. Sept. 25, 2014) (Fitzwater, C.J.) (citing *Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.)); *Hagan*, 529 F.3d at 624 (citation omitted).  As to the third element, the requirement that a plaintiff show at the prima facie case stage a "causal link" between a protected activity and an adverse employment action is "much less stringent" than the "but-for" causation that a jury must find.  *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see also Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (characterizing this prima facie case burden as "minimal").

If Miller establishes a prima facie case, the burden shifts to defendants to articulate a legitimate, nonretaliatory reason for the alleged retaliatory action taken.  *Hagan*, 529 F.3d at 624; *Walker*, 2005 WL 2278080, at *9.  This burden is one of production, not of proof. *See Wooten v. Fed. Express Corp.*, 2007 WL 63609, at *16 (N.D. Tex. Jan. 9, 2007) (Fitzwater, J.), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009).

If defendants meet their production burden, the burden shifts back to Miller to show "by a preponderance of the evidence that the reasoning presented by the defendant[s] is a

pretext for retaliation." *Smith v. Sw. Bell Tel. Co.*, 456 Fed. Appx. 489, 492 (5th Cir. 2012) (per curiam) (quoting *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 584 (5th Cir. 2006)) (internal quotation marks omitted).  At the summary judgment stage, Miller's burden is to raise a genuine issue of material fact regarding pretext.  *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) ("Because [defendant] has satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff]'s discharge, in order for [plaintiff] to survive summary judgment, he must create a genuine and material fact issue regarding the ultimate question of discrimination.").  A plaintiff can demonstrate pretext "by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citation and internal quotation marks omitted).  "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).  The ultimate determination in an FLSA retaliation case is whether the conduct protected by the FLSA was the "but for cause" of the adverse employment decision.  *Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 580 (5th Cir. 2004) ("This court has repeatedly stated that in retaliation cases [under the FLSA] the employee must prove that the adverse employment action would not have occurred 'but for' plaintiff's protected activity." (citing cases)); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S.Ct. 2517, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *Little v. Technical Specialty Prods. LLC*, 2013 WL

- 11 -

5755333, at *4 (E.D. Tex. Oct. 23, 2013) (noting that Fifth Circuit has repeatedly required that the plaintiff establish "but for" causation, which "is consistent with the Supreme Court's holding in *Nassar*, and, thus, the standard for FLSA retaliation cases was not altered by the *Nassar* decision.").

B

1

Defendants maintain that Miller cannot establish a prima facie case of retaliation because he cannot show that he engaged in "protected activity." They contend that Miller's alleged "complaints" to Munson and Thompson regarding Metrocare's overtime policy and failure to abide by DOL regulations and opinions concerning classification of employees and payment of overtime were all made in the context of his position as HR Director. Defendants posit that, under *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996), which the Fifth Circuit followed in *Hagan*, 529 F.3d at 627-28, Miller's complaints do not constitute "protected activity."

Miller responds that there is ample evidence that he engaged in activity to promote compliance with the FLSA, including repeatedly raising the issue of misclassification of case managers, showing Metrocare that the DOL viewed case managers as non-exempt, amassing evidence that other MHMRs had changed case managers' classifications to non-exempt, and relaying numerous complaints that Metrocare Service Coordinators were being forced to work "off the clock" and were being subjected to threats unless they misreported their time. He argues that he stepped outside the role of simply advocating for protecting Metrocare

- 12 -

because he acted out of a concern that Metrocare's actions would result not only in liability for the company but could also result in personal criminal and civil liability under 29 U.S.C. § 216(a). Miller contends that there is a recognized exception to *McKenzie* when the employer believes an employee is about to take action adverse against the employer by commencing an enforcement action, and that there is evidence that Metrocare believed that Miller was about to act adversely to Metrocare, outside of his HR duties, by organizing a strike or by going to the DOL.

2

The court concludes that Miller has failed to establish that he engaged in "protected activity" under the FLSA. According to defendants' undisputed summary judgment evidence, in Miller's role as HR Director, he served as Metrocare's compliance officer for the FMLA and the FLSA, and he was responsible for ensuring that Metrocare and its managers complied with both laws. In his summary judgment response, Miller contends that he engaged in "protected activity" by

> rais[ing] the issue of misclassification of case managers repeatedly, show[ing] Metrocare that the [DOL] viewed them as non-exempt, amass[ing] evidence that other MHMR[s] had changed their classification to non-exempt, and then relay[ing] numerous complaints that Service Coordinators were being forced to work "off the clock," and were being subjected to threats unless they misreported their time.

P. Br. 19. In *McKenzie* the Tenth Circuit held that a personnel director did not engage in protected activity when she advised her employer about potential violations of wage and hour laws because it was her job to monitor compliance with laws regulating the workplace. The

court explained:

> McKenzie never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and *asserting* a right adverse to the company. McKenzie did not initiate a FLSA claim against the company on her own behalf or on behalf of anyone else. Rather, in her capacity as personnel manager, she informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations. In order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file or threaten to file an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA. . . . There is no evidence in the record to suggest that McKenzie was asserting any rights under the FLSA or that she took any action adverse to the company; rather, the record reflects that McKenzie's actions in connection with the overtime pay issue were completely consistent with her duties as personnel director for the company to evaluate wage and hour issues and to assist the company in complying with its obligations under the FLSA. McKenzie therefore lacks an essential ingredient of a retaliation claim; that is, she did not take a position adverse to her employer or assert any rights under the FLSA. Accordingly, McKenzie did not engage in activity protected under § 215(a)(3)[.]

*McKenzie*, 94 F.3d at 1486-87 (footnotes omitted). In *Hagan* the Fifth Circuit adopted the approach taken in *McKenzie*, "find[ing] the logic of *McKenzie* to provide a correct and balanced approach." *Hagan*, 529 F.3d at 627. The *Hagan* panel explained:

> If we did not require an employee to "step outside the role" or otherwise make clear to the employer that the employee was taking a position adverse to the employer, nearly every activity in the normal course of a manger's job would potentially be protected activity under Section 215(a)(3). An otherwise typical

- 14 -

> at-will employment relationship could quickly degrade into a litigation minefield, with whole groups of employees—management employees, human resources employees, and legal employees, to name a few—being difficult to discharge without fear of a lawsuit.

*Id.* at 628.

As in *McKenzie* and *Hagan*, the conduct on which Miller relies to show that he engaged in "protected activity" is entirely consistent with his duties as HR Director. He has not shown that, by engaging in these activities, he stepped outside his role of representing Metrocare. It is undisputed that, in his role as HR Director, Miller was responsible for ensuring that Metrocare and its managers complied with the FLSA. His position therefore required that he interpret the statute and report to Metrocare any potential violations. His raising the issue of misclassification of employees and working to convince Metrocare to change the way it classified certain categories of employees thus constituted the performance of Miller's duties as HR Director, "to evaluate wage and hour issues and to assist the company in complying with its obligations under the FLSA." *McKenzie*, 94 F.3d 1487. To the extent Miller contends that he engaged in "protected activity" by relaying complaints that Service Coordinators were being forced to work "off the clock" and were being subjected to threats unless they misreported their time, he has not shown that he acted outside of his role as HR Director. *See Hagan*, 529 F.3d at 628 ("Voicing each side's concerns is not only *not adverse* to the company's interests, it is exactly what the company *expects* of a manager."). In fact, Miller averred in his declaration that he reported these complaints because he "believed these actions were exposing Metrocare to litigation risk." P. App. 9.

- 15 -

In sum, the conduct that Miller alleges constituted "protected activity" is not conduct that reasonably could have been construed or understood as a positive assertion of rights against Metrocare under or related to the FLSA either on Miller's behalf or on behalf of another Metrocare employee. *See Hagan*, 529 F.3d at 629 (citation omitted).

Miller contends that he stepped outside the role of simply advocating for protecting Metrocare because he acted out of a concern that Metrocare's actions would result not only in liability for Metrocare but could also result in personal civil and criminal liability.[7]  But Miller cites no authority for making such an exception to the holding and reasoning of *McKenzie*.  And if this exception were adopted, it would effectively erase the bright line between the employee's role as representative of the company and his role as complaining party based on the employee's subjective concerns about his own liability and his unexpressed motivations, which would not, as *Hagan* requires, make clear to the employer that the employee was taking an adverse position to the employer.  Such an exception would require that the employer not only evaluate the employee's conduct but attempt to divine what motivated it.

Finally, Miller contends that his conduct falls within a recognized exception under *McKenzie* where an employer believes an employee is about to take adverse action by commencing an enforcement action.  He maintains that defendants are contending they

---

[7]29 U.S.C. § 216(a) provides: "[a]ny person who willfully violates any of the provisions of section 215 of this title shall upon conviction thereof be subject to a fine of not more than $10,000, or to imprisonment for not more than six months, or both."

- 16 -

believed he was about to act adversely to Metrocare, outside his HR duties, by organizing a strike or going to the DOL based on Ross's complaint letter.

But the evidence on which he relies does not show that *Metrocare*—as opposed to *Ross*—believed that Miller was going to organize a strike.[8] And Miller cites no evidence that Metrocare believed that he was going to act adversely by going to the DOL.  Moreover, evidence that Munson was monitoring the network activity of Miller, Clark, and Reyna on the day before Clark and Reyna were terminated does not show that Metrocare believed Miller was about to take action adverse to the company by commencing an enforcement action.[9]

Because Miller has failed to show that he engaged in "protected activity," he has not met his obligation of establishing a prima facie case of FLSA retaliation.  Defendants are therefore entitled on this basis to summary judgment dismissing his FLSA-based retaliation claim.

---

[8]Ross states in her January 17, 2013 letter to Munson that, "[i]n a meeting, one of the affected staff expressed disappointment about being RIF'd and concern for staff left behind. [Miller] stated that, '[w]e should all quit[.]'  A staff member agreed and stated, '[t]hen what would they do[?']   This creates adversarial feelings of 'the department against management.'"  P. App. 347.

[9]In support of the causation element of his prima facie case, Miller contends that he was targeted for termination eliminated shortly after reporting concerns about Metrocare's practices to Joel Geary, Esquire ("Geary"), Metrocare's attorney, and to Thompson. Assuming that Miller intends to argue that reporting concerns about Metrocare's practices to Geary and Thompson constituted "protected activity," he has not shown that he reported these concerns outside his role as HR Director.

C

Alternatively, even if the court assumes *arguendo* that Miller can establish a prima facie case, defendants are still entitled to summary judgment because Miller has failed to adduce sufficient evidence for a reasonable jury to find that the adverse employment action that Miller sustained would not have occurred "but for" his protected activity.

Defendants have introduced evidence that Metrocare terminated Miller's employment because, *inter alia*, he excluded himself from annual background checks during 2010, 2011, and 2012; and he failed to ensure that background checks were conducted on another 70 employees in December 2012, but he updated the system to indicate that the background checks had been performed.  Accordingly, Miller is obligated to adduce sufficient evidence for a reasonable jury to find that this proffered reason is a pretext for retaliation.[10]

Miller contends that Metrocare's stated reasons for terminating his employment are pretextual because, despite the fact that he had a history of good performance reviews, Metrocare discharged him without first discussing the allegations against him or applying its progressive discipline policy.  Miller fails to adduce any evidence, however, that Metrocare was required to follow certain procedures before terminating an employee whom it found to

---

[10]Miller contends that he can prove retaliation under either a pretext alternative or a mixed-motive alternative.  P. Br. 22 (citing *Rachid v. Jack-in-the-Box, Inc.*, 376 F.3d 305, 312-13 (5th Cir. 2004)).  The court disagrees.  In the FLSA context, the Fifth Circuit has rejected the mixed-motives alternative for proving retaliation.  *See Garner v. Chevron Phillips Chem. Co.*, 834 F.Supp.2d 528, 539 n.4 (S.D. Tex. 2011) ("The Fifth Circuit has not extended the mixed motive analysis to FLSA retaliation claims[.]").  The court thus considers only whether Miller has raised a genuine issue of material fact regarding pretext.

have falsified business records.  He only avers that he "c[ould ]not recall any instances where an employee was fired without at least being offered the chance to defend against allegations of misconduct," and that "Metrocare normally followed a progressive discipline program." P. App. 15-16.  But Miller provides none of the details of the alleged "progressive discipline program," including, for example, whether certain types of conduct—including falsifying vital records and covering up misconduct—would subject an employee to immediate termination.  And he does not adduce any evidence, or even contend, that Metrocare actually violated its own internal policies.  *See, e.g. Paris v. Sanderson Farms, Inc.*, 542 Fed. Appx. 370, 375 (5th Cir. 2013) (holding that employer was entitled to summary judgment on FMLA claim where employee based pretext argument on employer's violation of "its own company policy," but failed to adduce evidence that employer had actually violated any company policy); *Grubb v. Sw. Airlines*, 296 Fed. Appx. 383, 390 (5th Cir. 2008) (per curiam) ("Failure to follow internal procedures is generally not enough to create a genuine issue of fact as to discriminatory motives.").  The fact that Metrocare "normally" followed certain procedures when terminating an employee that it did not observe when discharging Miller is insufficient to permit a reasonable jury to find that Metrocare's proffered reasons for terminating his employment are pretextual.

Miller next points to evidence that Ross knew of his criminal background at the time he was hired and informed Munson of that fact at that time; that any claim that he was taking his name off the background check list to conceal something is undermined by the fact that he asked Ross to run everyone in the company the day before he was fired; that of the list of

72 names that Miller allegedly failed to run, Munson was unable to identify any person who had new criminal activity; that Metrocare had allowed at least one physician who treated children to continue employment with a history of indecent exposure where the charges were disposed of by deferred adjudication; and that other HR Directors in the HR Consoria confirmed Miller's understanding that annual background checks were not required for administrative employees.  None of this evidence, however, is sufficient to create a genuine issue of fact on the question of pretext.  Metrocare's proffered reason for terminating Miller's employment is that he "falsified data entries" in Metrocare's system by failing to perform background checks on over 70 employees, yet updating the system to reflect that the checks had been run, and by excluding himself from annual criminal background checks.  D. App. 99.  Evidence that Munson already knew of Miller's criminal background, that there was no new criminal activity for the names Miller neglected to run in December 2012, that Miller believed annual background checks were not required for administrative employees, or that Metrocare had previously allowed continued employment for a physician who had a criminal background is insufficient to permit a reasonable jury to find that Metrocare did not actually terminate Miller's employment because it believed that Miller had "falsified data entries" and failed to run certain required criminal background checks.

Miller also maintains that Metrocare employee Wendell Owens ("Owens") was caught failing to check references of other employees, in violation of policy and contractual requirements, but was not terminated.  In support of this allegation, Miller avers:

> Unit Director [Owens] was accused of unprofessional conduct
> by impregnating one of his subordinates. Further, he was found
> to have not checked the background of employees by calling
> references of applicants in 2010, which was against Metrocare
> hiring policy and DADS contractual requirements. Lynda
> Thompson was made aware of these lapses in both cases.
> Owens was not terminated on either account. Owens reported
> to Linda Thompson when these events occurred. Thompson had
> a comparable management level to Munson at the time of the
> events, meaning that Owens has a comparable management to
> me.

P. App. 19. But even taking these facts as true, they would not enable a reasonable jury to

find that Metrocare's proffered reasons for terminating Miller's employment were pretextual.

Miller has not shown that Owens' failure was as extensive as Miller's (i.e., more than 70);

that Owen excluded himself from such checks over a multi-year period, despite the nature

of his position; and, probably most important, that Owens entered false information into

Metrocare's system indicating that the background checks had in fact been performed. *See,*

*e.g., Dooley v. Parks & Recreation for Parish of E. Baton Rouge, BREC*, 433 Fed. Appx.

321, 325 (5th Cir. 2011) (per curiam) (holding that plaintiff failed to rebut defendant's

legitimate, nondiscriminatory reason because, *inter alia*, he did not identify any similarly-

situated employee who was not terminated after similar conduct).

Miller also argues that Metrocare's complaints about the Wellness Fair "fail to meet

muster," P. Br. 25, because he warned Munson that firing two people from the HR

Department would require curtailing the Wellness Fair; the two employees who were fired

were the ones who had the most experience with the program; and he did not have time to

do the Wellness Fair after absorbing the responsibilities of two employees without a

reasonable accommodation.  Although Miller offers justifications for his conduct, he does not dispute that he canceled the Wellness Fair without first seeking permission from Munson or Thompson.  Nor does he provide any evidence that would enable a reasonable jury to find that Metrocare's dissatisfaction at Miller's canceling the Wellness Fair was pretext for FLSA retaliation.

Miller has failed to introduce evidence that would enable a reasonable jury to find that the proffered reason for his termination—Metrocare's belief that Miller had excluded himself from several annual criminal background checks and had falsified data entries to make it appear that background checks had been run on over 70 employees, when they had not—was not the real reason Metrocare terminated him.

Under the *McDonnell Douglas* burden-shifting framework "[t]he ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'"  *Reeves*, 530 U.S. at 146-47 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)).  In other words, "'[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'"  *Id.* at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519).  Aside from the fact that Miller worked extensively, in his position as HR Director, to ensure that Metrocare was in compliance with the requirements of the FLSA and to address employee concerns regarding wage and hour issues, Miller presents no evidence that his involvement with these issues, as opposed to some other reason, was the but-for cause of his termination.

Because a reasonable jury could not find that Miller's protected activity was the but-for cause of his termination, defendants are entitled to summary judgment dismissing his FLSA retaliation claim.

IV

The court next considers Miller's claims under the FMLA.  Miller alleges that all three defendants are liable under the FMLA for interfering with his rights to FMLA leave and for retaliating against him for engaging in FMLA-protected conduct.  Miller maintains that Munson and Thompson are individually liable because they acted directly or indirectly in Metrocare's interest.

A

The court turns first to Miller's FMLA retaliation claim brought under 29 U.S.C. § 2615(a)(2).

1

Because Miller relies on circumstantial evidence, his FMLA claim is properly analyzed under the *McDonnell Douglas* burden shifting framework.  *See, e.g., Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001) ("The Fifth Circuit applies the *McDonnell Douglas* framework to analyze retaliation claims under the FMLA.").

> To establish a prima facie case for . . . retaliation under the FMLA, a plaintiff must demonstrate that [he] is protected under the FMLA; [he] suffered an adverse employment decision; and that [he] was treated less favorably than an employee who had not requested leave under the FMLA or that the adverse decision was made because of [his] request for leave.

- 23 -

*Comeaux-Bisor v. YMCA of Greater Hous.*, 290 Fed. Appx. 722, 724-25 (5th Cir. 2008) (per curiam) (citing *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 384 (5th Cir. 1998)). "[O]nce an employee has established a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Stroud v. BMC Software, Inc.*, 2008 WL 2325639, at *3 (5th Cir. June 6, 2008) (FMLA case) (per curiam) (unpublished opinion). "In cases involving a potential mixed motive for the adverse employment action, to survive summary judgment the employee must 'offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or . . . (b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination.'" *Id.* (quoting *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005)).[11]

---

[11]The Fifth Circuit has not yet addressed whether the Supreme Court's reasoning in *Nassar*, 133 S.Ct. at 2528-33, in which the Court determined that the "but for" causation standard applies to retaliation claims under Title VII, also applies to the FMLA. Because the FMLA retaliation provision does not contain the same "because of" language that the Court interpreted in Title VII to require but-for causation, and because the Fifth Circuit has not indicated that *Richardson* is no longer controlling, the court will assume that a plaintiff bringing an FMLA retaliation claim can still proceed under the mixed-motives alternative. *See, e.g., Mathis v. BDO USA, LLP*, 2014 WL 975706, at *6 (S.D. Tex. Mar. 12, 2014) (stating that, "until a higher court says otherwise, the Supreme Court's decision in [*Nassar*] to require but-for causation in Title VII cases does not alter our calculus for FMLA cases.").

2

Assuming *arguendo* that Miller can establish a prima facie case of retaliation,[12] the court holds that Miller has failed to create a genuine issue of material fact either that Metrocare's proffered reason for Miller's termination—Metrocare's belief that Miller had excluded himself from several annual criminal background checks and had falsified data entries to make it appear that background checks had been run on over 70 employees, when they had not—is a pretext for retaliation, or that Metrocare's reason, although true, is but one of the reasons for its conduct, another of which was FMLA retaliation.

Miller bases his FMLA retaliation claim on the following: Metrocare fired him when he left to take a call about his mother's hospitalization; Munson tried to fire him while he was on FMLA leave for his own surgical procedure; Munson yelled at him and gave him the "silent treatment" after he opposed conduct he felt was illegal under the FMLA; Munson told him to scrutinize employees who were out on protected leave; and Ross's complaint included allegations about his attendance (including protected absences) and the manner in which he took FMLA leave. Miller also relies on the same evidence that he proffered in support of his FLSA-based retaliation claim, adding only that Munson's reliance on Ross's complaint memo, which included attendance and FMLA usage on her list of grievances, is evidence that

---

[12]Metrocare argues that the rationale of *McKenzie*, 94 F.3d 1487, applies not only to a retaliation claim under the FLSA but to one brought under the FMLA. Because the Fifth Circuit has not yet decided whether *McKenzie* applies to an FMLA-based retaliation claim and defendants are entitled to summary judgment on other grounds, the court will assume *arguendo* that Miller can establish a prima facie case of retaliation, including the required element that he engaged in protected activity.

Munson's decision was motivated, at least in part, by protected conduct.

The court has already held above, in the context of Miller's FLSA-based retaliation claim, that he has failed to create a genuine issue of material fact regarding pretext for retaliation. Miller's additional evidence that Ross included attendance and FMLA usage on her list of grievances against Miller is also insufficient to enable a reasonable jury to find that Metrocare terminated Miller in retaliation for engaging in protected activity under the FMLA. Ross's letter states, in pertinent part:

> [Miller] has overridden policies to benefit his own needs. For example: . . . FMLA, overrode the FMLA process to benefit him. This can be verified in the email exchange between the Director and Benefits Specialist, approximately around 12/19 or 12/20. . . . Work schedule – [Miller] proclaims that his work hours are 8 a.m. to 5 p.m. He comes in by 9 a.m. and leaves for lunch between 11 a.m. and Noon and returns to work between 2 p.m. and 2:30 p.m. He usually takes up to 3 hour lunches almost daily. He gets very defensive if you ask questions about his hours. He is not modeling the behavior that is expected of his staff. We are required to submit a personal leave request for time we are out.

P. App. 347 (emphasis omitted).

It bears noting at the outset that, according to the summary judgment evidence, Ross was an HR Generalist and a subordinate of Miller. Miller is attempting to attribute the complaints of one of his subordinates to Metrocare management. Absent evidence that Ross was a decisionmaker or someone who possessed leverage, or exerted influence, over the titular decisionmaker, Miller cannot raise a genuine issue of material fact based on the complaints of a subordinate. For example, to the extent Ross complained that Miller

"overrode the FMLA process to benefit him," *id.*, Miller has not adduced any evidence that this complaint about his overriding the FMLA process played any role whatsoever in Metrocare's decision to terminate his employment.

Moreover, even if Ross's complaints can be attributed to Metrocare management, Miller has not adduced evidence that would permit the reasonable finding that, when Ross was complaining about Miller's taking lunches that were too long or not keeping regular work hours, he was on approved FMLA leave.

Miller also contends that he "suffered yelling and the 'silent treatment' after opposing illegal conduct." P. Br. 36. He avers that Munson yelled at him when he told Munson he could not fire or discipline Rommel Landry while he was out on FMLA leave; that Munson yelled at him when sent an FMLA notification to Vivian Buckley; that Munson "was also upset" when Miller opposed the demotion of Marvin Williams while he was out on FMLA leave, and Munson stopped talking to Miller for an extended period after this; and that Munson pressured him to "scrutinize" Clark's attendance, and, when Miller raised that this was risky because Clark qualified for FMLA leave, Munson responded that "she's already taken enough time" and that Miller should "stay on it." P. App. 17-18.

The court holds that a reasonable jury could not find based on this evidence, alone or in combination with the other summary judgment evidence, the essential element of pretext or mixed-motive. Viewed favorably to Miller, this evidence would only permit the finding that, during the course of Miller's seven-year employment at Metrocare, Munson on a handful of occasions yelled at him or gave him the silent treatment when Miller opposed

actions that Miller thought violated the FMLA.  This proof is devoid of details about context and temporal proximity to when Miller was discharged.  And even Munson's two statements about Clark's attendance occurred once and amount to nothing more than stray remarks. "Stray remarks are insufficient to enable a claim to survive summary judgment when a plaintiff fails to produce substantial evidence of pretext." *Read v. BT Alex. Brown, Inc.*, 2002 WL 22060, at *4 (N.D. Tex. Jan. 7, 2002) (Fitzwater, J.) (citing *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 404-05 (5th Cir. 2001)), *aff'd*, 72 Fed. Appx. 112 (5th Cir. 2003).

Accordingly, the court holds that defendants are entitled to summary judgment dismissing Miller's FMLA-based retaliation claim.

## B

The court now considers Miller's FMLA interference claim.[13]

### 1

Under 29 U.S.C. § 2615(a)(1), an employer is prohibited from interfering with or restraining an employee from exercising, or attempting to exercise, his FMLA rights.  "The term 'interference with' includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'"  *Bell v. Dallas Cnty.*, 432 Fed. Appx. 330, 334 (5th Cir. 2011) (per curiam) (quoting 29 C.F.R. § 825.220(b) (2010)).  "With an interference claim, an employee must show that he was denied his entitlements under the

---

[13]Metrocare moves to strike this claim on the ground that it is first alleged in Miller's second amended complaint, which was filed after Metrocare filed its summary judgment motion.  Because the court is granting Metrocare's summary judgment motion, it denies this portion of the motion to strike as moot.

FMLA, or, that an employer did not respect the employee's FMLA entitlements." *Id.* (citing

*Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)).

2

Miller contends that Metrocare violated the FMLA by terminating his employment

while he was on intermittent leave to return a call about his mother's hospitalization. As the

Fifth Circuit has explained:

> As a general proposition, an employee who requests or takes
> protected leave under the FMLA is not entitled to any greater
> rights or benefits than he would be entitled to had he not
> requested or taken leave. This principle is not only reflected in
> FMLA regulations on reinstatement, but is also a matter of
> common sense. Moreover, at least for purposes of the
> FMLA—if not the ADA—one can be fired for poor
> performance even if that performance is due to the same root
> cause as the need for leave. Therefore, given that SWA's
> termination of Grubb was otherwise appropriate, any right to
> leave would have been extinguished by SWA's exercise of that
> prerogative.

*Grubb*, 296 Fed. Appx. at 391 (brackets, citations, and internal quotation marks omitted).

As in *Grubb*, Miller has failed to adduce sufficient evidence to enable a reasonable jury to

find that Metrocare's termination of his employment interfered with his rights under the

FMLA. Stated another way, if Metrocare had a legitimate, nondiscriminatory reason for

terminating Miller's employment, it did not violate the FMLA by terminating him while he

was on FMLA leave. Accordingly, even if the court assumes *arguendo* that Miller left work

to return a telephone call about his mother's hospitalization, and that this qualified under the

FMLA as intermittent leave, a reasonable jury could not find that Metrocare interfered with

an FMLA right to leave by terminating him during this time.   And Metrocare's valid termination of Miller's employment on February 28, 2013 extinguished any right to leave that he had thereafter.   *See id.*; *see also Esparza v. Bank of Am., N.A.*, 2013 WL 5208024, at *7 (N.D. Tex. Sept. 17, 2013) (Fitzwater, C.J.) (concluding that because reasonable jury could only find that employee was terminated for legitimate, nondiscriminatory reasons, she "[could not] recover on her FMLA interference claim based on [her employer's] termination of her employment three days before her FMLA leave was set to commence.").

Accordingly, the court holds that defendants are entitled to summary judgment dismissing Miller's FMLA-based interference claim.

V

The court now turns to Miller's claims asserted against Metrocare under the ADA, beginning with the claim that Metrocare failed to reasonably accommodate Miller's disability.

A

The ADA prohibits discrimination in employment against a qualified individual on the basis of his disability.  42 U.S.C. § 12112(a).  Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  *Id.* § 12112(b)(5)(A).  To prevail on an ADA failure-to-accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual

with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (footnote and internal quotation marks omitted).

Miller contends that he suffers from dyslexia, which interferes with his ability to read and communicate by entering data, and that, after the RIF, during which two of his subordinates were terminated, Metrocare failed to make a reasonable accommodation by hiring a part-time data entry clerk (specifically, by re-hiring Reyna on a part-time basis). Metrocare moves for summary judgment on Miller's ADA failure-to-accommodate claim, contending, *inter alia*, that Miller's requested accommodation is unreasonable as a matter of law. The court agrees.

The ADA does not "require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999). "If [the employee] can't perform the essential functions of his job absent assigning those duties to someone else, (e.g., having someone else perform his job) then [the employee] can not be reasonably accommodated as a matter of law." *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998); *see also Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997) ("[T]he law does not require an employer to transfer from the disabled employee any of the essential functions of his job."). As a matter of law, Metrocare's re-hiring Reyna as a part-time data entry clerk would have been an

unreasonable accommodation of Miller's dyslexia disability

Moreover, in January 2013 Metrocare eliminated at least eight employees, including Reyna, as part of a RIF that was intended to reduce costs. A reasonable jury could not find that requiring Metrocare to re-hire an employee whom it had terminated as a cost-saving measure would be a reasonable accommodation.

Accordingly, the court concludes that Metrocare is entitled to summary judgment dismissing Miller's ADA failure-to-accommodate claim.

B

Miller also alleges that Metrocare discriminated and retaliated against him, in violation of the ADA, by terminating his employment.

1

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the . . . discharge of [an] employee[ ]." 42 U.S.C. § 12112(a). The ADA also provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *Id.* § 12203(a). In a discriminatory termination action under the ADA, where the employee relies on circumstantial evidence, the court proceeds under the *McDonnell Douglas* burden-shifting analysis set out above. *See E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). "'To establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1)

that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability.'" *LHC Grp.*, 773 F.3d at 697 (alteration in original) (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)). "To establish a prima facie case of retaliation under the ADA . . . a plaintiff must show that (1) [he] participated in an activity protected under the statute; (2) [his] employer took an adverse employment action against [him]; and (3) a causal connection exists between the protected activity and the adverse action." *Feist*, 730 F.3d at 454.

2

Miller maintains that he was terminated based on his disability because he requested a reasonable accommodation, and/or because he complained about the failure to provide a reasonable accommodation. As with Miller's FMLA claim, the court will assume *arguendo* that Miller can meet his obligation of showing a prima facie case for discrimination and retaliation under the ADA. Because, as explained above concerning Miller's FLSA and FMLA claims, Metrocare has articulated a legitimate, nondiscriminatory reason for terminating Miller, the court focuses on whether Miller has adduced sufficient evidence to enable a reasonable jury to find that Metrocare's proffered reason for terminating Miller is pretextual, or that Metrocare's reason, although true, is but one of the reasons for its conduct, another of which was discrimination or retaliation.[14]

_____

[14]In *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (per curiam), the Fifth Circuit held that "[u]nder a plain reading of the statute, and in accord with the position of other circuits, we conclude that the ADA does not require 'sole causation.' The proper causation standard under the ADA is a 'motivating factor' test." Subsequent to *Pinkerton*,

To raise a genuine issue of material fact regarding pretext and mixed-motive, Miller relies largely on the same evidence that the court has concluded above is insufficient to enable a reasonable jury to find in his favor.  Miller also "note[s] that he was terminated shortly following his request for reasonable accommodations, and that his inability to pull of[f] the Wellness Fair without additional time, which was one of his requests, is being used as a reason for the termination."  P. Br. 42.  Metrocare does not contend, however, that it terminated Miller based on his inability to timely pull off the Wellness Fair.  To the extent the Wellness Fair factored into the decision to terminate Miller, the summary judgment record only contains evidence that this was because of Miller's unilateral decision to *cancel* the fair without first obtaining permission.  Miller points to no other evidence that would enable a reasonable jury to find that Metrocare terminated him based on his dyslexia, his request for an accommodation for his dyslexia, or his complaints about any failure to accommodate his disability.

Accordingly, the court holds that Metrocare is entitled to summary judgment

---

the Supreme Court held that the mixed-motives alternative is unavailable in the similarly-worded discrimination provision in the Age Discrimination in Employment Act of 1967 ("ADEA").  *See Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 174-76 (2009).  *Gross* held that the mixed-motives argument was unavailable because, among other reasons, the ADEA's relevant provision prohibits discrimination "because of" age instead of employing Title VII's broader prohibition of discrimination that is a "motivating factor" for an employment practice.  *Id*. at 176; *see also Nassar*, 133 S.Ct. at 2532 (holding that the mixed-motive argument is not available in the context of a Title VII retaliation claim, which must be proved according to traditional principles of but-for causation).  The court need not decide whether the mixed-motive alternative is available to Miller in the context of his ADA because, even assuming *arguendo* that it is, Metrocare is entitled to summary judgment.

dismissing Miller's ADA retaliation and discrimination claims based on his termination.

VI

The court now turns to Miller's § 1983 claim.

A

"Section 1983 provides a civil remedy in federal court for violations, under color of state law, of a person's constitutionally recognized rights, privileges, or immunities." *Bledsoe v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006) (citing *Findeisen v. N.E. Indep. Sch. Dist.*, 749 F.2d 234, 236-37 (5th Cir. 1984)). "If the government discharges an employee amidst allegations of misconduct, the employee may have a procedural due process right to notice and an opportunity to clear his name." *Id.* (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)). "A public employee, even an at-will employee, has a constitutional right to notice and an opportunity to be heard when the employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities.'" *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012) (quoting *Bledsoe*, 449 F.3d at 653). "Neither damage to reputation alone nor the stigma resulting from the discharge itself trigger the protections of due process." *Bledsoe*, 449 F.3d at 653 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 (5th Cir. 1984)) (footnote omitted). "Rather, a liberty interest is infringed, and the right to notice and an opportunity to clear one's name arises, only when the employee is 'discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him

- 35 -

from other employment opportunities.'" *Id.* (quoting *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. Nov. 1981)).

The Fifth Circuit "employs a seven-element 'stigma-plus-infringement' test to determine whether § 1983 affords a government employee a remedy for deprivation of liberty without notice or an opportunity to clear his name." *Id.* (citing *Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000)).

> The plaintiff must show: (1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request.

*Id.* (citing *Hughes*, 204 F.3d at 226).

### B

In *Miller I* the court held that Miller had failed to plead a plausible § 1983 claim because he admitted that Metrocare offered him the opportunity to clear his name during the public portion of its April 25, 2013 Board of Trustees' meeting; failed to plausibly allege that he was given insufficient notice; and failed to plausibly allege that he had a right to confront or cross-examine Metrocare's trustees or employees that was infringed. *Miller I*, 2014 WL 3512975, at *4-5. The court permitted Miller to replead his § 1983 claim. *Id.* at *5.

In his second amended complaint, Miller adds a single allegation to the claim. He asserts that his "due process rights were further trampled when Defendant changed the reasons for the alleged discharge without notice to Plaintiff, and provided secret testimony

to the Board of Trustees to justify the termination." 2d Am. Compl. ¶ 8.06. This new allegation does not change the court's conclusion in *Miller I* that Miller failed to plausibly allege a claim under § 1983. Accordingly, the court holds that Metrocare is entitled to summary judgment dismissing this claim.[15]

*   *   *

For the foregoing reasons, defendants' motion for summary judgment is granted, and this action is dismissed with prejudice by judgment filed today.

**SO ORDERED**.

February 5, 2015.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[15]Because the court is granting defendants' motion for summary judgment, it denies as moot their motion strike to certain summary judgment evidence and their motion to strike portions of Miller's second amended complaint.